**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ADVANCED MULTILEVEL CONCEPTS, INC., ABLE DIRECT MARKETING INC., KEN NAIL, ESTHETICS WORLD, INC., INTERNATIONAL BUSINESS, INC., and IRV PYUN,<br><br>        Plaintiffs,<br><br>v.<br><br>EDWARD BUKSTEL, VITAMINSPICE, INC., RICHARD F. SEELIG, AND DOES 1 through 30, inclusive,<br><br>        Defendants. | Case No. 11-CV-3718<br><br>Honorable Michael M. Baylson<br><br>**EDWARD BUKSTEL'S and VITAMINSPICE, INC.'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |

Pursuant to Fed. R. Civ. P. 8, 12, 13, 18, and 20, and other governing rules and case law, Defendants, EDWARD BUKSTEL ("Bukstel") and VITAMINSPICE, INC. ("VitaminSpice"), hereby respond to Plaintiffs' Complaint with their Answer, Affirmative Defenses, Counterclaims and Third-Party Claims. Bukstel and VitaminSpice have filed a Motion to Dismiss the Complaint or Disqualify Plaintiffs' Counsel for Attorney Misconduct (the "Motion"), and Bukstel and VitaminSpice hereby respond to the Complaint subject to the Motion and without waiving or otherwise limiting the grounds set forth in the Motion. Bukstel and VitaminSpice also respond to the Complaint without waiving or otherwise limiting their right to move to dismiss the Complaint on additional grounds pursuant to governing rules and case law.

## ANSWER

### PARTIES AND JURISDICTION

1.      Plaintiff Advanced Multilevel Concepts, Inc. ("Advanced") is a Nevada corporation which acquired 3,666,283 shares of common stock of Defendant, VitaminSpice, Inc. ("VitaminSpice", "VTMS" or "Company"), of which it now holds 1,940,000 (Rule 144 restricted) shares.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1.

2.      Plaintiff Able Direct Marketing ("Able") is a Wyoming corporation which acquired 3,037,180 shares of VitaminSpice on conversion of a promissory note on September 28, 2009, and now holds 0 shares.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2.

3.      Plaintiff Ken Nail ("Nail") is a natural person residing in Nevada who acquired and owns 2,500,000 (Rule 144 restricted) shares of VitaminSpice.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3.

4.      Plaintiff Esthetics World ("Esthetics") is a Wyoming corporation which acquired 3,037,180 shares of VitaminSpice on conversion of a promissory note on September 28, 2009, and also 120,000 shares in a cash purchase dated February 16, 2010, and now owns 159,357 shares of VitaminSpice in its brokerage account and 120,000 shares which have never been delivered to it (the latter shares will be referred to as the Misappropriated Shares).

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4.

5.      Plaintiff International Business Development ("IDB") is a California corporation which owns 1,850,000 (Rule 144 restricted) shares of VitaminSpice which it acquired when its interests in Vitamin Spice, LLC (VitaminSpice's predecessor) were exchanged for the VitaminSpice shares in September 2009.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5.

6.      Plaintiff Irv Pyun ("Pyun") is a natural person, residing in North Carolina, who bought 150,000 shares in 2009 in a private transaction for $50,000.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6.

7.      In total, Plaintiffs own or owned 11,362,820 shares of VitaminSpice which are the subject of this Complaint.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7.

8.      Defendant VitaminSpice, Inc. ("VitaminSpice", "VTMS" or "Company") is a Wyoming corporation whose common stock trades on the OTC Bulletin Board under the symbol VTMS.OB.  The company maintains a principal place of business in Chester County, at 996 Old Eagle School Road, Suite 1102, Wayne, Pennsylvania.

**ANSWER:**

Admitted.

9.      Defendant Edward Bukstel ("Bukstel") is a President and a Director of VitaminSpice.  Bukstel founded the predecessor to the Company, Vitamin Spice, LLC, in Wayne, Pennsylvania in 2008.

**ANSWER:**

Admitted.

10.     Defendant Richard F. Seelig ("Seelig") is and was a member of the Company's Board of Directors at all times relevant to the Complaint.  Seelig has a residential address of 13266 Solana Beach Cove, Delray Beach, FL 33446-5653.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10.

11.     Stalt, Inc. ("Stalt" or "Transfer Agent") is a California corporation which at all relevant times was the registered Transfer Agent for VitaminSpice.

**ANSWER:**

Admitted.

12.     Defendants Does 1 through 30 are unknown at this time, and are therefore used by such fictitious names.  Each of the Defendants designated as such is responsible in some manner for the events and happenings referred to herein.  Plaintiffs will request leave of the Court to amend this Complaint to insert the true names and capacities of Does 1 through 30 when that information has been ascertained.

**ANSWER:**

Paragraph 12 lacks factual allegations and, therefore, no answer is necessary.  To the extent an answer to this paragraph would be necessary or appropriate, Bukstel and VitaminSpice deny the same.

13.     Jurisdiction is proper in this Court as to Plaintiffs Nail, Advanced and IDB pursuant to 28 U.S.C. § 1332 because the conflict underlying this suit is between residents of different States, Jurisdiction is proper in this court as to all Plaintiffs pursuant to 28 U.S.C. § 1331 because Plaintiffs plead for relief pursuant to a federal statute that prohibits fraud in the securities markets.  Plaintiffs plead for relief from one overarching fraudulent scheme that is featured at the core of this Complaint, out of which all other state law breaches and their corresponding injuries arose.  Venue in this District is proper pursuant to Pa.R.Civ.P. 1006 in that Defendant Company maintains a principal place of business in this District; transactions and occurrences took place here in which the cause of action arose; and the Company has caused harm and/or injury by act or omission taking place in this District.

**ANSWER:**

Bukstel and VitaminSpice admit that the Court has subject-matter jurisdiction over this action, including over their counterclaims and third-party claims.  Bukstel and VitaminSpice specifically deny that "the Company has caused harm and/or injury by act or omission taking

place in this District," and lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of paragraph 13.

## FACTUAL BACKGROUND

14.     Bukstel started Vitamin Spice, LLC (privately held predecessor to Defendant
VitaminSpice) in 2008 in Pennsylvania.  He raised money from local investors in order to
develop a commercially marketable product, that is, vitamin infused spices.

**ANSWER:**

Admitted.

15.     In 2009, Bukstel decided to take Vitamin Spice, LLC public in order to raise
funds for marketing and sales launch.  He did so by causing Vitamin Spice, LLC to enter into a
"reverse merger."   A "reverse merger" is a transaction in which a private company, such as
Vitamin Spice, LLC, merges with a publicly trading shell company and thereby becomes
publicly trading in a matter of days.  This allows the company to access the capital markets
without the outsized compliance costs of "going public" via an initial public offering.

**ANSWER:**

Bukstel and VitaminSpice deny that Bukstel alone caused VitaminSpice to enter into a

"reverse merger."  Bukstel and VitaminSpice admit that the remaining allegations of paragraph

15 describe a "reverse merger" as explained by VitaminSpice's counsel Jehu Hand.

16.     In September 2009, Bukstel began discussions with Jehu Hand ("Hand"), a
securities lawyer based in Orange County, California regarding the prospective merger with a
"shell company" owned by Jehu Hand's brother, Learned Hand ("Learned").   Bukstel was
interested in Learned's shell, Qualsec LLC ("Qualsec") because Qualsec was an extremely
"clean" shell.

**ANSWER:**

Bukstel and VitaminSpice deny that "Bukstel was interested in Learned's shell, Qualsec

LLC ('Qualsec') because Qualsec was an extremely 'clean' shell," but admit the remaining

allegations of paragraph 16.

17.     Plaintiffs Able and Esthetics were, at the time of the reverse merger, part of a
group of Qualsec noteholders, to whom the corporation owed $130,000 for cash loans.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 17.

18.     In August of 2009, Bukstel travelled to Orange County to meet with Learned and Jehu Hand, at the Marriot Courtyard Hotel in Irvine, CA to discuss the merger.  Because VitaminSpice was thinly capitalized and could barely cover its operating costs, it was imperative for Bukstel to garner concessions from Learned and the existing Qualsec shareholders and noteholders ("Qualsec Group"), namely that the merger would proceed with no case down payment to the Qualsec Group and that the noteholders would convert their debt into equity so that post-merger VitaminSpice would not have any holdover liabilities.

**ANSWER:**

Bukstel and VitaminSpice admit the first sentence of paragraph 18, but deny the

remaining allegations of paragraph 18.

19.     Bukstel wanted to pay for the shell using company stock.  In practical terms, this amounts to a "stock deal", where the new company compensates the former owners of the shell company with equity in the new company, in lieu of any cash payment.  Accordingly, the Qualsec Group would only receive a return on its investment if and when the post-merger company performed well, generating revenues and other value that would be reflected in an increase stock price.  At the August 2009 meeting in Irvine, CA, the Qualsec Group agreed to transfer control to Bukstel solely in exchange for securities in the post merger Company.

**ANSWER:**

Bukstel and VitaminSpice admit that the allegations of paragraph 19 reflect advice

provided by VitaminSpice's counsel Jehu Hand, and that Bukstel and VitaminSpice followed

that advice, but deny the remaining allegations of paragraph 19.

20.     At the meeting in Irvine, Bukstel was successful in negotiating significant concessions from Learned and Plaintiff debt holders, as detailed above.  At the meeting, Bukstel convinced Plaintiffs Abel Direct Marketing, Esthetics World and others to forego the $130,000 debt owed to them by the corporation, in exchange for stock in the post-merger company.

**ANSWER:**

Denied.

21.     Shell companies such as Qualsec typically sell on the market for $300,000 to $500,000 in cash paid at the time of merger.  Relative to industry standards, the terms of the

reverse merger were very favorable to Bukstel.  Plaintiffs Able and Esthetics agreed to the terms because they believed Bukstel had a good product and that Bukstel would be a competent and hardworking CEO who would make every effort to behave in a manner befitting the CEO of a publicly traded company.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 21, but deny the remaining allegations of paragraph 21.

22.     Plaintiffs relied on Bukstel's promise that he would do everything in his power to make the company successful.  They believed him when he promised to make every effort to advance Company interests and generate a satisfactory return on their investment.  Plaintiffs understood this promise to mean that he would protect their interests, in conformance with his fiduciary duty to them as shareholders, and behave lawfully towards them at all times.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the allegations in paragraph 22 regarding what Plaintiffs "relied on," "believed" or "understood," but deny that Bukstel violated any such "promise" alleged in paragraph 22.

23.     Plaintiffs agreed to Bukstel's proposed terms and the transaction closed at the end of September 2009.  Bukstel and his VitaminSpice LLC investors, including IDB, received 100 million new shares.  The existing debt holders and shareholders in the Qualsec Group retained 21,000,000 shares of Company stock.  Plaintiff Advanced purchased its shares from other shareholders in the Qualsec Group, including 1,511,280 shares which were derived from the promissory notes.  The public company was renamed VitaminSpice.  Vitamin Spice, LLC became the wholly-owned subsidiary.

**ANSWER:**

Bukstel and VitaminSpice admit that the allegations of paragraph 23 purport to describe the terms of the reverse merger as designed and engineered by VitaminSpice's counsel Jehu Hand, but deny that Bukstel "proposed" those terms.

24.     Jehu Hand was so convinced by Bukstel's sincerity that he agreed to stay on as corporate counsel with the post-merger company and defer payment for his legal services.  When Bukstel lacked cash to afford a bookkeeper, Jehu Hand performed those services for

VitaminSpice, again deferring payment.   In addition to services provided in exchange for deferred payment, Jehu Hand also advanced tens of thousands of dollars to cover VitaminSpice expenses out of his pocket.   Furthermore, Vitamin Spice raised significant funds through Jehu Hand's contacts.  Jehu Hand recruited and paid for the salary of an attorney to serve as Bukstel's interim office manager.  Jehu Hand wished to do everything possible so that the merger would be a success for all relevant parties.

**ANSWER:**

Bukstel and VitaminSpice admit that Jehu Hand served as corporate counsel for

VitaminSpice, but deny the remaining allegations of paragraph 24.

25.     Despite Jehu Hand's recurring contributions of free labor and financial support, Bukstel become uncooperative and antagonistic.  Of the seven quarterly and annual reports that VitaminSpice has filed since the merger, six of them were submitted late; in one case the filing was one month late, or 2 weeks beyond the extension period permitted by the Federal Securities Laws.  The tardy filings were caused by Bukstel's inability to submit paperwork such as receipts and expense reports in a timely manner.  Financial reporting was excessively complicated due to the fact that Bukstel made no effort to distinguish his personal expenses from those properly billed to Company accounts.  These indiscretions on the part of Bukstel became a point of contention between him and Jehu Hand.

**ANSWER:**

Denied.

26.     In the following months, Bukstel repeatedly failed to present himself at critical meetings with investors and strategic partners, and consistently failed to follow through on business commitments.  No sales were being made, although there was distributor demand for the product.  Professional service providers and Jehu Hand repeatedly admonished Bukstel that he had to maintain internal controls required by the SEC, and to cease using the company bank account for impermissible personal expenses such as liquor and for charges at establishments offering adult entertainment.

**ANSWER:**

Denied.

27.     Hand noticed several accounting improprieties in Bukstel's management of Company affairs which Hand found unethical and non-complaint.   Firstly, he noticed that Bukstel was in the habit of billing the company debit card for personal expenses, in breach of the Sarbanes-Oxley Act of 2002.  These impermissible charges often included alcohol purchases and expenditures at establishments offering adult entertainment services.

**ANSWER:**

Denied.

28.     Bukstel also failed to implement and enforce any "internal controls" regulating Company cash flows.  For example, the Sarbanes-Oxley Act of 2002 requires that managers at publicly traded companies "segregate" duties, wherein one manager writes checks from the Company ledger and another employee or outside consultant signs the checks.  In this way, the opportunity for fraud is reduced by a system of checks and balances.  To the contrary, and despite the fact that Jehu Hand paid for the second employee's salary, Bukstel failed to segregate duties in that he wrote, signed and accounted for all Company checks without any independent verification whatsoever.

**ANSWER:**

Denied.

29.     Hand also received several independently corroborated reports, in February and March of 2010, that Bukstel made a habit of consuming alcohol every day, often during business hours.

**ANSWER:**

Denied.

30.     When Hand installed a junior attorney at the Company in January of 2010, Bukstel refused to cooperate with this attorney in establishing a set of internal controls.

**ANSWER:**

Denied.

31.     Hand was deeply concerned because the lack of internal controls posed an extremely high risk for fraud at the Company.  Hand found this state of affairs particularly troublesome as the recurring allegations of drinking and his own observations regarding Bukstel's accounting improprieties made Bukstel seem less trustworthy with each passing day.

**ANSWER:**

Denied.

32.     Between January and June of 2010, Hand and other professional advisors reached out to Bukstel via email and telephone at least 8 times, imploring him, in very specific terms, to rectify his code of conduct so that his accounting procedures and internal controls were complaint with Sarbanes-Oxley and the federal securities laws.

**ANSWER:**

Denied.

33.     On March 5, 2010, Hand travelled from California to Company headquarters in Wayne Pennsylvania, at his own expense, for the purposes of addressing accounting problems and other improprieties that were hampering Company affairs.  Despite having been given several days notice, Bukstel failed to appear for the meeting and did not provide any explanation for his failure to appear.

**ANSWER:**

Denied.

34.     Regardless of Hand's best efforts to rectify the situation, Bukstel's non-complaint behavior continued unabated and Bukstel ignored any suggestion that his accounting methods were improper or that his conduct was otherwise non-compliant with federal law.

**ANSWER:**

Denied.

35.     In accordance with fiduciary duties to shareholders that bind all lawyers employed by publicly traded companies, Hand reported Bukstel's recurring non-compliance to the Company board of directors on July 5, 2010.

**ANSWER:**

Denied.

36.     On July 6, 2010, Bukstel terminated Hand as company counsel and bookkeeper.

**ANSWER:**

Admitted.

37.     On or around July 12, 2010, Bukstel initiated a systematic effort to block Plaintiff shareholders from selling their holdings in Company stock.

**ANSWER:**

Denied.

38.     On information and belief, Bukstel launched this systematic effort to harm Plaintiffs for two reasons.  On one hand, it was an effort to harm Plaintiffs due to their relationship with Hand and in retaliation for his July 5 report to the board of directors.

**ANSWER:**

Denied.

39.     On information and belief, Bukstel's efforts at blocking the sales also formed the foundation of a stock manipulation scheme designed to enrich Bukstel and his confederates at the expense of Plaintiffs and other public shareholders.

**ANSWER:**

Denied.

40.     Bukstel's first effort at blocking sale of Plaintiff's shares was to instruct the transfer agent, Stalt, Inc. to impose a "stop order," on all shares titled in Plaintiffs' names, whereby any transfer or sale of the shares is delayed at least 30 days from the date on which the selling shareholder orders transfer.  No broker will accept "stopped" shares for deposit into a trading account because the marketability of those shares has been called into question and no broker wishes to become embroiled in a dispute by depositing stock certificates on which an adverse claim has been made.

**ANSWER:**

Denied.

41.     Secondly, Bukstel instructed Stalt to refuse removal of the Rule 144 "restrictive legend" from Plaintiffs Advanced, IDB and Nail's stock certificates, regardless of whether or not the restricted period had expired and regardless of whether or not the shares were free to trade pursuant to the federal securities laws.  In short, Bukstel issued a directive to Stalt preventing the sale of all shares titled in Plaintiffs' names.  Furthermore, on information and belief, Bukstel placed telephone calls to several brokers where Plaintiffs had accounts holding VitaminSpice shares, including OC Securities and Spartan Securities, and claimed that Plaintiffs' VitaminSpice shares were fraudulent and that they could not be lawfully sold.

**ANSWER:**

Denied.

42.     On information and belief, Bukstel made these representations to these brokers with full knowledge that his claims were patently false.

**ANSWER:**

Denied.

43.     All Plaintiffs made timely demand that their shares be transferred and sold and/or that the restrictive legend be removed from their shares without delay, as permitted by operation of the federal securities laws.

**ANSWER:**

Denied.

44.     Defendants Vitaminspice and Bukstel categorically denied these requests and, with regards to the denial of legend removal, instructed the Transfer Agent to ignore any outside opinion letters that the restrictive legend may be removed, while at the same time refusing to provide an opinion from its own counsel, Wolfgang Heimerl.  This effectively blocked sale of Plaintiffs shares.

**ANSWER:**

Denied.

45.     On information and belief, Bukstel employed these various strategies in an effort to systematically disenfranchise Plaintiffs of their right to sell their holdings in Company stock. Bukstel's actions were not motivated by any lawful business purpose whatsoever, but rather, were entered into out of spite and in retaliation for Jehu Hand's July 6 report to the Company Board of Directors, and in furtherance of his stock manipulation scheme.

**ANSWER:**

Denied.

46.     Plaintiffs were harmed in an amount to be proven at trial, when the price at which Company shares were trading plummeted dramatically while the various stop orders initiated by Bukstel were still in place.

**ANSWER:**

Denied.

47.     On July 12, 2010, when Bukstel first imposed a stop order on Plaintiffs' shares, the trading price for Company shares closed at $0.20/share.  On January 19, 2011, while sale of Plaintiffs' shares was still blocked by Bukstel, VTMS shares closed at $0.41/share.  On May 31, 2011, on or around the time of filing this complaint, the Company shares closed at $0.03/share.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to

the allegations in paragraph 22.

48.     Plaintiff Esthetics, Able and Nail filed an action in California state court in November, 2010 against VitaminSpice and Stalt, similar to this action; it was dismissed against VitaminSpice on jurisdictional grounds.  While lawsuit was pending, however, VitaminSpice let Able transfer its shares to the name of its broker and permitted Advanced to transfer its 1,726,283 free trading shares to the name of its broker as well, so that these parties could partially mitigate their damages; these shares have been sold for net proceeds of approximately $350,000 to Able and a lesser amount to Advanced; Advanced still holds about 400,000 non-restricted shares.

**ANSWER:**

Bukstel and VitaminSpice admit that Esthetics, Able and Nail filed an action in

California state court, and that the action was dismissed, but deny the remaining allegations of

paragraph 48.

49.     On information and belief, VitaminSpice only permitted these transfers a the time because it was under intense scrutiny by the California court overseeing the then pending lawsuit.

**ANSWER:**

Denied.

50.     Once the proceeding was dismissed against VitaminSpice, it resumed its normal course of conduct and reissued the previously imposed stop orders.

**ANSWER:**

Denied.

51.     Plaintiffs hereby allege damages in an amount to be measured by subtracting the price at which Company shares are eventually sold from $0.41/share, then multiplying this difference by the number of shares Plaintiffs owned.

**ANSWER:**

Denied.

52.     Plaintiff Esthetics World also alleges damages for the wrongful misappropriation of the Misappropriated shares.

**ANSWER:**

Denied.

53.     Plaintiffs pray for leave of this Court to make a more precise determination of losses relating to the stop orders and refusal to remove the restrictive legends at the time that the remainder of Plaintiffs' shares are released and/or actually sold.  Based on the market price of Company shares at the time of filing this Complaint, Plaintiffs estimate their current damages to approximate $3,967,871.

**ANSWER:**

    Denied.

54.     Bukstel also used the stop transfer to implement a fraudulent market manipulation scheme.  Bukstel's stop transfer of July 12, 2010 effectively froze substantially all of the free trading shares of VTMS, because Plaintiffs and the other persons who were the subject of the stop orders constituted almost all of the float.  On November 1, 2010, the trading volume for VTMS was 64,700, historically normal.  On November 2, 2010, the trading volume exploded to 3,777,100 and to 4,425,200 on November 3.  The remainder of the month of November saw continued heavy volume.  Since Bukstel had locked up almost all of the free trading shares, the explanation has to be found as to the source of these free trading shares.  The pat answer from VTMS would be that the trading volume reflected the release from restriction of shares held by the VitaminSpice LLC shareholders on October 28, 2010 (one year from the date on which the "Super 8-K" was signed disclosing consummation of the merger, at which time the shares became freely tradable pursuant to application of the Exchange Act and Rule 144(i) promulgated thereunder).

**ANSWER:**

    Denied.

55.     This cannot be true for 3 reasons, First, a comparison with the Form 10-K for the year ended December 31, 2010 with the 2009 10-K does not reveal any diminution in the number of shares held by the VitaminSpice LLC shareholders.  Secondly, there were no Form 144s filed to evidence resale of these shares, as would be required by the federal securities laws governing sales of restricted shares by insiders.  Finally, since the process of depositing stock certificate of a "penny stock" such as VTMS is onerous, taking at least 2 weeks in the best case, there was not enough time from October 28, 2010 (a Friday) to November 2, (a Tuesday) to deposit the shares in the seller's account, even if VTMS were a NYSE stock.

**ANSWER:**

    Denied.

56.     The answer to this question – where did the "free trading" shares come from  - is found in VTMS's public reports.  VitaminSpice's Quarterly Reports on Form 10-Q for the quarters ended March 31 (p. 15 of VitaminSpice Form 10-Q viewable at sec.gov), June 30 (p. 20, ibid) and September 30, 2010 (p. 20, ibid) indicate that the Company issued a total of 300,000 shares of stock for cash consideration in an amount of $75,000 during the first quarter of 2010

(ending March 31, 2010) (See, Exhibits A – C, attached hereto and incorporated by reference). This included the Misappropriated Shares – the 120,000 shares of stock sold, but never delivered, to Esthetics World on February 16, 2010, for its cash consideration of $30,000 (See, Exhibits D-E, attached hereto and incorporated herein by reference).   There were two other shareholders who bought the other 180,000 shares sold for cash in the March 31, 2010 quarter. These shares, the names of the purchases, and the case paid by each are confirmed by VTMS's general accounting ledger prepared in connection with the March 31, 2010 10-Q.

**ANSWER:**

    Denied.

57.   Although Esthetics World made timely demand, VitaminSpice never delivered the stock certificate embodying the Misappropriated Shares to Esthetics World.

**ANSWER:**

    Denied.

58.   The Company did not report any intervening "material events" that would have changed the size of the issuance reported in the Form 10-Qs detailed above.   The Annual Report filed for 2010 (p. 22, ibid) ballooned the number of shares issued, for the same $75,000, from 120,000 shares, to 7,500,000 shares (See, Exhibit F, attached hereto and incorporated herein by reference).   On information and belief, Bukstel misappropriated Esthetic's World's 120,000 shares, and fraudulently inflated the number of shares "issued" during calendar 2010 from 300,000 to 7,500,000, in order to generate 7,320,000 shares (7,500,000 shares minus the 180,000 shares issued to the other two investors) that could be employed in a fraudulent scheme.

**ANSWER:**

    Denied.

59.   In essence, Bukstel caused VTMS and its transfer agent, Stalt, to issue 7,320,000 of backdated shares to his confederates for no consideration to the Company.   Bukstel told Stalt that the payment for the 7,320,000 shares had been made in February, 2010 (from Esthetics World's $30,000) and asked Stalt to not only backdate the certificate to February 16, 2010, he also misled Stalt into believing the six month Rule 144 holding period had tolled (by August 16, 2010).

**ANSWER:**

    Denied.

60.   In this way, Bukstel could artificially inflate the trading price while his confederates, now controlling the "float," sold shares into the market, thereby reaping illicit gains at the expense of Plaintiffs and the investing public.

**ANSWER:**

     Denied.

     61.    The sale of shares to Esthetics World and others provided "cover" for Bukstel by which he could "piggy-back" a massive, fraudulent issuance under the guise of Esthetics World's purchase.

**ANSWER:**

     Denied.

     62.    The terms presented to Plaintiff Esthetics World regarding its investment of $30,000 were the Esthetics World would receive 120,000 shares of Company stock.  No mention was made that an illicit issuance of 7.32 million shares would be issued months later and "piggy-backed" onto Esthetics World's share issuance through an unlawful backdating scheme.

**ANSWER:**

     Denied.

     63.    Plaintiff Esthetics World relied on this omission in making its investment decision.

**ANSWER:**

     Denied.

     64.    On information and belief, Bukstel knew at the time of sale of securities to all Plaintiffs, originally in August of 2009, that he intended to employ the issuance of VitaminSpice securities as a vehicle for fraud in order to enrich himself and his inner circle of confederates.

**ANSWER:**

     Denied.

     65.    On information and belief, Bukstel acted in conscious disregard of his knowledge when he originally sold securities to all Plaintiffs, in August of 2009, without disclosing his intent to later issue a substantial sum of fraudulent shares without registration and in breach of the securities laws in order to enrich himself and his confederates.

**ANSWER:**

     Denied.

66.     All Plaintiffs relied on this material omission in making their investment decision in that they would have negated the sale if they knew at the time of purchase that the Company and Bukstel would later dilute their holdings in Company stock by 5% and put significant downward pressure on the stock price through a fraudulent stock manipulation scheme involving the sale of unregistered securities in breach of the federal securities laws.

**ANSWER:**

Denied.

67.     Furthermore, Bukstel did not disclose to Esthetics World at the time of sale that stock certificates embodying the promised securities would never be delivered.

**ANSWER:**

Denied.

68.     Plaintiff Esthetics World relied on this omission in making its investment decision.

**ANSWER:**

Denied.

69.     Had the omitted facts detailed above been disclosed to Plaintiff Esthetics World at the time of sale, they would have cause it to void the sale because it did not to want to be defrauded or to participate in a fraudulent scheme.

**ANSWER:**

Denied.

70.     On information and belief, Bukstel deliberately omitted these facts in order to ensure that Plaintiff would invest desperately-needed funds into the Company and in order to perpetuate his stock fraud.

**ANSWER:**

Denied.

71.     On information and belief, Bukstel knew at the time of sale that he intended to unlawfully "piggy-back" a later illicit share issuance onto the same of shares made to Plaintiff Esthetics World.

**ANSWER:**

Denied.

72.     On information and belief, Bukstel knew at the time of sale issuance the he would be unwilling or unable to deliver the promised shares as promised to Esthetics in the investment agreement.  The shares promised to Esthetics were due upon payment, therefore any problems at the Company that made delivery impossible or impracticable were either extant or rapidly developing at the time Bukstel accepted funds from Esthetics on February 16, 2010.  Bukstel deliberately or recklessly failed to inform Esthetics of extant Company problems and/or his own fraudulent intent, either or both of which led to non-delivery of the shares.

**ANSWER:**

Denied.

73.     Plaintiff Esthetics World was injured in an amount to be proven at trial when it was promised and paid for 120,000 shares which were never delivered and which consequently could not sell.

**ANSWER:**

Denied.

74.     All Plaintiffs were injured when the Company issued 7,320,000 million shares for no consideration to the Company, while Plaintiffs were unable to avoid losses related to the ensuing dilution and diminution of the share price because the Company and Bukstel had issued stop orders against Plaintiffs' shares.  This issuance diluted the number of the shares outstanding by roughly 5%.  Dilution of this magnitude reduced the value of all Company shares, on information and belief, by an amount significantly greater than 5%, because of the aggressive manner in which the shares were being sold into the market.

**ANSWER:**

Denied.

75.     Plaintiffs suffered losses when the value of their shares diminished consequent to the Company's fraudulent share and the concurrent drop in the share price, which Plaintiffs could not mitigate because the fraudulent scheme also involved the issuance of stop orders against their shares.  Accordingly, Plaintiffs lost roughly $3,967,871 due to the stock manipulation that both reduced the price and blocked Plaintiffs from selling to avoid losses.

**ANSWER:**

Denied.

**FIRST CAUSE OF ACTION**
**Breach of UCC Section 8-401 and 8-403(b) – Defendants VitaminSpice and Bukstel**

76.     The above allegations are incorporated herein by this reference.

**ANSWER:**

Bukstel and VitaminSpice repeat and re-allege all previous paragraphs above as their

answer to paragraph 76.

77.     Plaintiffs' stock is a "certificated security" as that term is defined under Article 8
of the Code.

**ANSWER:**

Bukstel and VitaminSpice admit that VitaminSpice's stock is a "certificated security."

78.     The Company is an "issuer" as that term is defined under Article 8 of the Code.

**ANSWER:**

Admitted.

79.     Neither Bukstel nor the Company had the authority to prohibit the sale of the
Plaintiffs' shares in July of 2010, or at any time after that date.

**ANSWER:**

Denied.

80.     The transfer of the shares as requested by Plaintiffs would not have violated any
restriction on transfer imposed by Article 8 of the Code.

**ANSWER:**

Denied.

81.     Plaintiffs were each an "appropriate person" as defined by Article 8 of the Code at
the time that they each instructed that the shares be transferred.  Plaintiffs were entitled to
transfer their securities at will, pursuant to UCC 8-401.

**ANSWER:**

Denied.

82.     Neither the Bukstel nor the Company is an "appropriate person" as defined by Article 8 of the Code.

**ANSWER:**

The allegations of paragraph 81 constitute a legal argument for which no answer is necessary or appropriate.  To the extent such an answer to this paragraph is necessary or appropriate, Bukstel and VitaminSpice admit the same.

83.     Neither Bukstel nor the Company could lawfully demand that the Transfer Agent not transfer the shares or not remove the restrictive legend on the shares.

**ANSWER:**
Denied.

84.     Bukstel, in his capacity as CEO of VTMS, has maintained an unlawful stop order on shares held by Plaintiffs Advanced since October 7, 2010 and on all other Plaintiffs' shares since July 12, 2010.

**ANSWER:**

Denied.

85.     These stop orders are in breach of Uniform Commercial Code 8-403(b) because such a stop order may only be demanded by an appropriate person," defined in UCC 8-107(a)(1) as the person whose name is listed on the certificate, or Plaintiffs.

**ANSWER:**

Denied.

86.     As a direct and proximate result of Defendants Bukstel and VitaminSpice's violation of UCC-8-401 and UCC 8-403 and other related provisions, Plaintiffs have been damages in an amount to be established at trial, which is currently estimated to be $3,967,871.

**ANSWER:**

Denied.

87.     Plaintiffs pray for leave of the Court to make a more precise determination of losses relating to the stop orders and refusal to remove the restrictive legends at the time that the remainder of Plaintiffs' shares are released and/or actually sold.

**ANSWER:**

Denied.

## SECOND CAUSE OF ACTION
### Conversion – Defendants VitaminSpice and Bukstel

88.     The above allegations are incorporated herein by this reference.

**ANSWER:**

Bukstel and VitaminSpice repeat and re-allege all previous paragraphs above as their

answer to paragraph 88.

89.     Plaintiffs own and are entitled to possession of the shares of VitaminSpice stock described in the preceding paragraphs.

**ANSWER:**

Denied.

90.     Defendants improperly exercised dominion or assumed control over these Shares.

**ANSWER:**

Denied.

91.     Plaintiffs have been damaged by the Defendants' conversion in an amount to be established at trail, which is currently estimated to be $3,967,871.

**ANSWER:**

Denied.

92.     Plaintiffs pray for leave of the Court to make a more precise determination of losses relating to Defendants' conversion of Plaintiffs shares the time that the remainder of Plaintiffs' shares are delivered, released and/or actually sold.

**ANSWER:**

Denied.

## THIRD CAUSE OF ACTION
### Breach of Director's Duty of Due Care – Defendant Seelig

93.     The above allegations are incorporated herein by this reference.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

94.     Wyoming Statutes §§ 17-16-830, 17-16-831 provide that officers and directors of a corporation have fiduciary duties to act in good faith and in the best interests of the corporation and its shareholders at all times.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

95.     Wyoming Business Corporation Ac § 17-16-801 requires that a public corporation's Board of Directors exercise oversight over such matters as management performance, business performance, preparation of the financial statements, policies and practices to foster compliance with law and ethical conduct, and the effectiveness of internal controls.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

96.     As the only sitting outside director at al times relevant to this Complaint, Seelig abdicated his duties pursuant to Wyoming law and allowed Bukstel to systematically defraud his investors with impunity.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

97.     In its reports filed with the SEC, the Company has disclosed three (3) lawsuits filed against the Company by seven (7) distinct plaintiffs, each alleging malfeasance related to

the issuance or delivery of stock certificates after the Company had received funds from investors.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

98.    The existence and public disclosure of these legal complaints from seven (7) different Plaintiffs, each alleging similar claims against the Company, should have alerted Seelig that the Company may be engaged in unlawful conduct related to a breach of duty to its shareholders.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

99.    As a sitting board member, Seelig was obligated by Wyoming law to conduct an investigation regarding the recurring allegations of fraud leveled at Bukstel by Company investors.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

100.    On information and belief, Seelig failed to conduct any serious investigation, merely taking Bukstel at his word and/or conducted a perfunctory, superficial investigation and ignored the possibility that Bukstel may be acting in bad faith and lying in order to cover up his own malfeasance.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

101.    Any investigation that may have been conducted was inadequate to satisfy Seelig's duty of care as a sitting director of a publicly traded company.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

102.    Seelig's breach of his duties as a director allowed Bukstel to continue his fraudulent scheme unimpeded and caused Plaintiffs corresponding injury in an amount currently estimated at $3,967,871.

**ANSWER:**

The Third Cause of Action is against Defendant Seelig alone.  Accordingly, no answer by

Bukstel or VitaminSpice is necessary or appropriate.

<u>**FOURTH CAUSE OF ACTION**</u>
**Breach of Officer's Duty of Loyalty – Defendant Bukstel**

103.    The above allegations are incorporated herein by this reference.

**ANSWER:**

Bukstel repeats and re-alleges all previous paragraphs above as his answer to paragraph

103.

104.    Wyoming Statute § 17-16-842 provides that officers of a corporation have fiduciary duties to act in good faith and in the best interests of the corporation and its shareholders at all times.

**ANSWER:**

The allegations of paragraph 81 constitute a legal argument for which no answer is

necessary or appropriate.  To the extent such an answer to this paragraph is necessary or

appropriate, Bukstel admits the same.

105.    Bukstel breached this duty when he knowingly ordered an unlawful stop order, and unlawfully refused to allow removal of the restrictive legend from Plaintiffs' shares, in a deliberate effort to block Plaintiff shareholders from selling, trading or transferring their shares.

**ANSWER:**

Denied.

106.    Bukstel breached this duty when he intentionally orchestrated a fraudulent stock manipulation scheme for the purpose of enriching himself and an inner circle of confederates, at the expense of Plaintiffs and the investing public.

**ANSWER:**

Denied.

107.    On information and belief, Bukstel's actions as detailed above lack any business purpose whatsoever and were motivated exclusively by the desire to harm any shareholders connected to Jehu Hand and further motivated by Bukstel's desire to enrich himself and his confederates at the expense of Plaintiffs and the investing public.

**ANSWER:**

Denied.

108.    Bukstel's harmful conduct was intentional and made with reckless and wanton disregard of Plaintiffs' rights.

**ANSWER:**

Denied.

109.    Bukstel's conduct proximately caused Plaintiffs economic harm when they were unlawfully denied the right to sell their shares.

**ANSWER:**

Denied.

110.    Plaintiffs suffered further injury when the price of these shares dropped significantly, while the same of shares was still unlawfully blocked, due in large part to Bukstel's ongoing market fraud.  Plaintiffs were damaged in an amount to be proven at trial, currently estimated to be 43,967,871.

**ANSWER:**

Denied.

111.    Because Bukstel acted in knowing disregard of his fiduciary duties and with the specific intent to harm his own shareholders, Plaintiffs hereby plead for punitive and exemplary damages against Bukstel.

**ANSWER:**

Denied.

## FIFTH CAUSE OF ACTION
### Punitive Damages – Defendant Bukstel

112.     The above allegations are incorporated by this reference.

**ANSWER:**

Bukstel repeats and re-alleges all previous paragraphs above as his answer to paragraph

112.

113.     Defendant Bukstel's conduct was malicious, fraudulent, and oppressive under Pennsylvania Law.

**ANSWER:**

Denied.

114.     Plaintiffs are entitled to actual, punitive, and exemplary damages according to proof.

**ANSWER:**

Denied.

## SIXTH CAUSE OF ACTION
### Fraud in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5
### 15 USC 78J AND 17 CFR 140.10B-5 – Defendant VitaminSpice, and Messrs. Bukstel and Seelig, as controlling persons under Exchange Act Section 20(a)

115.     The above allegations are incorporated herein by this reference.

**ANSWER:**

Bukstel and VitaminSpice repeat and re-allege all previous paragraphs above as their

answer to paragraph 115.

116.     Defendant VitaminSpice, directly and indirectly, with scinter, including with recklessness disregard, in connection with the purchase and sale of securities (See Sec v. Zanford, 535 U.S. 813 (2002)), by use of the means or instrumentalities of interstate commerce, or of the mails, have employed devices, schemes or artifices to defraud; have made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

have engaged in acts practices or courses of business which have been and are operating as a fraud upon the purchasers or sellers of such securities.

**ANSWER:**

    Denied.

    117.    The statements made by VitaminSpice, or omissions of material facts, are that in its Quarterly Reports for the quarters ended June 30, 2010 and September 30, 2010, and its Annual Report for the year ended December 31, 2010 VitaminSpice failed to disclose that it had imposed a stop transfer on substantially all of the public float, and had misappropriated the subscription by Esthetics to issue 7,320,000 shares to confederates of Bukstel, which shares were issued for sale, without registration, in the public markets by Bukstel's confederates, while the sale price was artificially inflated by Bukstel's stop orders.  The identity of Bukstel's confederates is unknown to Plaintiffs at this time and they are therefore sued as Does.

**ANSWER:**

    Denied.

    118.    These actions by VitaminSpice and the confederates of Bukstel are part of a scheme designed to defraud Plaintiffs and the public and enrich Defendant, and which operated as a fraud on Plaintiffs by preventing them from selling their shares on the public market controlled by Bukstel and the Doe Defendants.

**ANSWER:**

    Denied.

    119.    Defendant VitaminSpice made these material misstatements and omitted to disclose the material facts regarding the stop transfer and the issuance of unregistered securities with scienter.  Scienter means either with knowledge of the falsity or with deliberate, reckless disregard of the truth.  The Company is required to report in Part II of the Quarterly Reports and in the Annual Report any sale of unregistered securities.  VitaminSpice backdated the issuance of the 7,320,000 unregistered shares (virtually all of the float) to February 2010 without disclosing the same in its reports filed with the SEC.  On information and belief, Bukstel acted with specific intent to enrich himself and his confederates as the expense of Plaintiffs and the investing public.

**ANSWER:**

    Denied.

    120.    Meanwhile, after these unregistered shares were issued, in November 2010, the trading volume of VitaminSpice's common stock ballooned to over 3,000,000 shares per day.

**ANSWER:**

Bukstel and VitaminSpice lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120.

121.    By reason of the foregoing conduct, Defendants VitaminSpice and the unknown Does have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

**ANSWER:**

Denied.

122.    Messrs. Bukstel and Seelig, as directors of VitaminSpice, are also liable for the violations of Section 10(b) and Rule 10b-5 as controlling persons under Exchange Act Section 20(a).   Each of these persons signed the Annual Report on Form 10-K that contained the misstatements of material fact and omissions to state material facts.

**ANSWER:**

Denied.

123.    As a direct and proximate result of Defendants VitaminSpice and the unknown Does fraud, and that of Defendants Bukstel and Seelig, Plaintiffs sustained and will continue to sustain damages currently estimated to be $3,967,871, in that they have been prevented from selling their shares at all or at the times at which they wished to sell, and as for Plaintiff Esthetics, its 120,000 shares which it paid for but which were delivered to one of Bukstel's confederates.   Under Section 10b and Rule 10-b5, Plaintiffs are also entitled to treble damages.

**ANSWER:**

Denied.

**<u>AFFIRMATIVE DEFENSES</u>**

**First Affirmative Defense**
**(Unclean Hands, Estoppel)**

Plaintiffs' claims are barred and/or estopped by their unclean hands and improper conduct.  As alleged in the Counterclaims and Third-Party claims below, the allegation of which are incorporated herein by reference, Hand used shell and alter-ego companies over which he exercised control – Advanced, Able, Esthetics and International – to seize and control

VitaminSpice shares in violation of securities laws.  Hand also has unclean hands by virtue of his multiple breaches of fiduciary and ethical duties to VitaminSpice, his client, including Hand's frauds, concealments, and use of confidential information and attorney-client communications to harm and damage VitaminSpice in this case and otherwise.

**Second Affirmative Defense**
**(Plaintiffs' Own Conduct)**

Plaintiffs are barred from any recovery and relief because their purported damages, if any, were caused by their and Hand's own conduct and misconduct.  The allegations of the Counterclaims and Third-Party Claims below are incorporated herein by reference.

**Third Affirmative Defense**
**(Stock Fraud)**

Plaintiffs' claims are barred because Jehu Hand has used shell companies and his alter-egos – Advanced, Able, Esthetics and International – to perpetrate a scheme of stock fraud by securing unlawful legal and beneficial control over VitaminSpice's shares and wrongfully manipulating the price of such shares.  The allegations of the Counterclaims and Third-Party Claims below are incorporated herein by reference.

**Fourth Affirmative Defense**
**(No Standing)**

Plaintiffs lack standing to assert their claims because: (a) they have suffered no damages as a result of the alleged conduct; (b) they engaged in conduct for improper purposes; and (c) their allegations are part of a scheme under which Hand has used his shell and alter-ego companies – Advanced, Able, Esthetics and International – to profit from the acquisition and sale of VitaminSpice stock in violation of securities law and common law.

**Fifth Affirmative Defense**
**(No Damages)**

Plaintiffs have paid none of their own funds in connection with the VitaminSpice stock, and they have suffered no damages as a result of the alleged conduct.  Instead, the funds were purchased with proceeds from Jehu Hand's bank accounts, including his client-trust account. The allegations of the Counterclaims and Third-Party Claims below are incorporated herein by reference.

**Sixth Affirmative Defense**
**(Conflicts of Interest and Ethical Improprieties)**

Plaintiffs' claims are barred because the Complaint is based on allegations that rely on purported information learned during the course of Jehu Hand's service as counsel for VitaminSpice.  Accordingly, Hand has breached his ethical duties to Bukstel and VitaminSpice, and the Complaint should be dismissed and/or stricken on those grounds.  At a minimum, Hand should be disqualified from serving as counsel for Plaintiffs in this case.

**Seventh Affirmative Defense**
**(Alter Ego)**

Plaintiffs' claims are barred because the purportedly corporate Plaintiffs – Advanced, Able, Esthetics and International – are not legitimate corporations, but rather are Jehu Hand's alter-egos.  Hand exercises total domination and control over those entities, and uses them to accomplish improper purposes.  The allegations of the Counterclaims and Third-Party Claims below are incorporated herein by reference.

**Ninth Affirmative Defense**
**(No Payment)**

Plaintiffs' claims are barred because the purported corporate Plaintiffs – Advanced, Able, Esthetics and International – did not pay any of their own monies for VitaminSpice stock.

Rather, they paid monies that were commingled from various persons and entities into Jehu Hand's client-trust account, which Hand used as a clearinghouse to profit from multiple stock transactions in which he used corporate alter-egos as shell companies to purchase stock over which he exercised legal and beneficial ownership and control.   The allegations of the Counterclaims and Third-Party Claims below are incorporated herein by reference.

WHEREFORE, Bukstel and VitaminSpice respectfully request this Court to deny all relief to Plaintiffs and to award to Bukstel and VitaminSpice their costs, attorneys' fees, plus such further relief as the Court deems just and appropriate under the circumstances.

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Counterclaim and Third-Party Edward Bukstel ("Bukstel") and VitaminSpice, Inc. ("VitaminSpice"), hereby submit their Counterclaims and Third-Party Claims against Jehu Hand ("Hand"), Advanced Multilevel Concepts, Inc. ("Advanced"), Able Direct Marketing, Inc. ("Able"), Esthetics World, Inc. ("Esthetics"), and International Business Development, Inc. ("International"), (Advanced, Able, Esthetics and International are collectively referred to herein as "Counter-Defendants").  In support hereof, Bukstel and VitaminSpice state as follows:

### Parties, Jurisdiction, Venue

1.     Bukstel is a Pennsylvania citizen with his residence and domicile in the State of Pennsylvania.

2.     VitaminSpice is a Wyoming corporation with its principal place of business in the State of Pennsylvania.

3.     Hand is a California citizen with his residence and domicile in the State of California.

4.      Advanced is a Nevada corporation with its principal place of business in the State of Nevada.  Advanced is Hand's alter-ego, as alleged further below, and uses Hand's California address as an office.

5.      Able is a Wyoming corporation with its principal place of business in the State of Wyoming.  Able is Hand's alter-ego, as alleged further below, and uses Hand's California address as an office.

6.      Esthetics is a Wyoming corporation with its principal place of business in the State of Wyoming.  Esthetics is Hand's alter-ego, as alleged further below, and uses Hand's California address as an office.

7.      International is a California corporation with its principal place of business in the State of California.  International is Hand's alter-ego, as alleged further below, and uses Hand's California address as an office.

8.      The Court has jurisdiction over these Counterclaims and Third-Party Claims pursuant to 28 U.S.C. § 1331, in that this action arises under the laws of the United States.  The Court also has pendent and ancillary jurisdiction over these Counterclaims and Third-Party Claims.

9.      The Court has personal jurisdiction over Hand and Counter-Defendants, who have engaged in continuous and systematic contacts with the State of Pennsylvania, have purposefully availed themselves of the benefits and the laws and commerce of the State of Pennsylvania, and have committed wrongful and tortious activities, including those giving rise to these Counterclaims and Third-Party Claims, in the State of Pennsylvania.  Hand and Counter-Defendants also have consented to the jurisdiction of the State of Pennsylvania by filing a civil action here.

**Factual Allegations**

10.     Hand is a California-based attorney.  He became VitaminSpice's counsel in June 2009.

11.     In January 2010, Hand became an Officer in VitaminSpice as Corporate Counsel.

12.     Shortly after he became VitaminSpice's corporate counsel, Hand developed and engineered a plan to seize control over a substantial number of shares of VitaminSpice's stock.

13.     Hand's plan involved acquiring VitaminSpice's stock through the use of his shell companies – Counter-Defendants – which Hand treated and used as his alter-egos.  According to Hand's plan, Counter-Defendants would acquire large amounts of VitaminSpice's stock through a "reverse merger," which is a frequently abused mechanism by which private companies are merged into publicly traded shell companies.  The purported "investors" in the publicly traded shell company (debt holders and shareholders) then receive stock in the publicly traded merged entity, often by issuing promissory notes rather than paying legitimate consideration.  That process allows those who control the "investors" to seize and exercise control over the ownership and trading of the stock, which often increases in value.  The "investors" (and those who control them) then control the outstanding shares (the "float") of the stock, and use their control to their financial benefit.

14.     Hand specializes in reverse mergers and uses them to profit from stock acquired by shell entities over which he exercises domination and control.  Hand, however, does not disclose that fact to others, and he did not disclose that fact to VitaminSpice or Bukstel when they hired Hand as counsel or at any other time.

15.     In September 2009, Hand proposed that VitaminSpice enter into a reverse merger with a shell company owned by Hand's brother, Jeremiah Learned Hand.  That shell company was called Qualsec, Inc., Symbol QLSC.OB ("Qualsec").

16.     While serving as VitaminSpice's counsel, Hand convinced Bukstel and VitaminSpice to proceed with the reverse merger.  Hand did so in order to profit personally from the deal.

17.     Hand concealed, and failed to disclose to Bukstel and/or VitaminSpice, that Hand controlled Counter-Defendants, which acquired VitaminSpice stock as a result of the reverse merger.   Able, Esthetics and International received such shares as debt holders and/or shareholders in Qualsec, and Advanced purchased its shares from Qualsec's shareholders.

18.     Hand created, incorporated, controlled, and ran each of the Counter-Defendants. Purporting to serve as their "counsel," Hand incorporated Counter-Defendants and enlisted the help of persons under his control to serve as Counter-Defendants' purported shareholders and officers.   The same persons, in fact, were enlisted repeatedly by Hand to serve as purported shareholders and officers for various Counter-Defendants, including Yuriy Semenov and others who live overseas and take their direction and instruction from Hand with regard to Counter-Defendants' business operations.   Hand also used names of persons who were either fictitious or deceased to serve as Counter-Defendants' purported shareholders and officers, such as "William Wilkinson," who is listed as a shareholder and/or officer for multiple companies controlled by Hand including Counter-Defendants.

19.     Because of Hand's control over Counter-Defendants, Hand had control over, and legal and beneficial ownership of, the VitaminSpice stock purportedly owned by Counter-Defendants.

20.     Hand concealed, from Bukstel and VitaminSpice, his ownership and control over Counter-Defendants and the VitaminSpice stock purportedly owned by Counter-Defendants.  In addition, Hand misrepresented, to Bukstel and VitaminSpice, that Counter-Defendants were distinct and viable entities.

21.     Hand undertook various measures to misrepresent that Counter-Defendants were distinct and viable entities rather than shells and his alter-egos.  Hand used invalid addresses for Counter-Defendants; Hand used deceased or non-existent persons, and/or persons over whom Hand exercised control, as purported officers of Counter-Defendants, and Hand executed forged and fraudulent documents in order to give the misimpression that Counter-Defendants were controlled by other persons.

22.     Hand also exercised control over Counter-Defendants to transfer VitaminSpice shares to other shell entities that Hand used as his alter-egos.  For example, Hand controlled Counter-Defendants to transfer VitaminSpice shares to an entity called Duluth Venture Capital Partners, LLC, which is controlled solely by Hand, not the purported "Managing Partner," William Wilkinson, who is either a fictitious person or someone who, according to Hand, was at a hospice, and about to pass away, years ago.  Indeed, the non-existent or deceased Wilkinson also is Qualsec Partners, LLC's purported "President."

23.     Hand used his control over Counter-Defendants and their VitaminSpice stock to profit and enrich himself through the trading of such stock.  Hand orchestrated hundreds of transactions with VitaminSpice stock, including public sales of such stock as well as private transactions in which he transferred such stock between and among Counter-Defendants.  Hand profited from these efforts by receiving monies that were deposited into bank accounts over which he exercised total control, including Hand's "client-trust" account, which Hand used as a

clearinghouse for transfers of monies by and to Counter-Defendants and other companies over which Hand exercised control. Hand actually used his "client-trust" account as his own personal bank account, and Hand treated, used and profited from the funds therein as though they were his own. Hand's profits resulted in the diversion of substantial funds from VitaminSpice, which was damaged thereby.

24.    Hand concealed and misrepresented all of the above-alleged facts with the intention of inducing Bukstel and VitaminSpice to work with Hand, execute contracts, and undertake other efforts that allowed Counter-Defendants to own and trade VitaminSpice stock. And Bukstel and VitaminSpice did rely on Hand's misrepresentations and misrepresentations by working with Hand, executing contracts, and undertaking other efforts that allowed Counter-Defendants to own and trade VitaminSpice stock.

25.    At all times relevant to Bukstel's and VitaminSpice's allegations, Counter-Defendants were Hand's alter-egos. Counter-Defendants were grossly undercapitalized; they failed to abide by corporate formalities; they have not had shareholder meetings; they have been controlled by Hand at his discretion; and they have been used to accomplish wrongful and unjust purposes and schemes of the person controlling it. In particular, Counter-Defendants were Hand's alter egos because, among other things:

> a. Counter-Defendants are influenced and governed by Hand. This is established by, among other things, facts showing that: Hand has exercised complete dominance and control over Counter-Defendants, such Counter-Defendants are mere shells and instrumentalities for the conduct of Hand's personal business activities; Hand used Counter-Defendants as a mere shell for Hand's business activities, including the purchase and sale of VitaminSpice's stock over which

Hand asserted ownership, domination, and control;  Hand directed and guided Counter-Defendants' decisions and conduct in connection with the VitaminSpice stock at issue as well as other decisions and conduct; Hand, not Counter-Defendants' lone "officers" and/or employees, controlled and directed the funding, purchase and sale of VitaminSpice stock at issue; Counter-Defendants deferred to Hand in connection with their decisions and operations; Hand had control over Counter-Defendants' monies and operations; and Counter-Defendants did not undertake any substantive business activities without Hand's direction, instruction and control.

b.   There is a unity of interest and ownership such that Counter-Defendants and Hand are inseparable and the separate personalities of Counter-Defendants and Hand never existed.  This unity of interest and ownership is established by, among other things, facts showing that:  Hand commingled Counter-Defendants' alleged funds with Hand's own funds in his client-trust account and personal account; Hand profited personally from Counter-Defendants' business transactions, including Counter-Defendants' purported purchase of VitaminSpice stock, which was secured through funds deposited into Hand's bank account rather than Counter-Defendants' own funds or assets; Hand failed to attempt to distinguish Counter-Defendants' funds from his own funds; Hand used Counter-Defendants' funds to pay debts and satisfy obligations owed by Hand personally and/or by his other shell companies that he uses as alter-egos; Counter-Defendants failed to maintain adequate and legitimate minutes, failed to maintain adequate corporate records, and failed to document and/or memorialize significant or substantive corporate

decisions in any manner; Hand used his address as Counter-Defendants' alleged business address; at Hand's direction and instruction, there was no capital invested in Counter-Defendants; at Hand's direction and instruction, Counter-Defendants had no corporate assets; Hand concealed and misrepresented to Bukstel, VitaminSpice and others that Counter-Defendants were distinct, viable entities; Hand concealed his personal business through the artifice of Counter-Defendants, including the purchase and sale of VitaminSpice stock and other corporate stock over which Hand asserted ownership, domination, and control; Hand disregarded legal formalities in his dealings with Counter-Defendants, including exercising total control over Counter-Defendants' decision-making and failing to take direction or guidance from anyone at Counter-Defendants with regard to decisions made by Hand in connection with Counter-Defendants; Counter-Defendants had no legitimate business purpose, function, or focus; and Hand failed to maintain arms-length relationships between and among Counter-Defendants and Hand's other related entities, including the use by Hand of such other entities' funds for purposes of purchasing stock purportedly on behalf of Counter-Defendants.

26.     Fraud or injustice, including harm and damage to Bukstel and VitaminSpice, would result if Counter-Defendants were permitted to maintain the fiction of a separate identity. Hand used Counter-Defendants in order to conduct Hand's personal business in violation of securities laws and his ethical duties to VitaminSpice and Bukstel.  For example, Hand used Counter-Defendants as a front to purchase and control VitaminSpice stock, in violation of disclosure and ownership requirements under securities laws.  Moreover, it would be inequitable

and unfair if Counter-Defendants were permitted to recover from Bukstel or VitaminSpice in this case, as though Counter-Defendants were separate entities.  Accordingly, the Court should find that Counter-Defendants are Hand's alter egos in order to avoid such inequitable results.

27.    In early July 2010, Bukstel became aware of Hand's scheme, including his use of shell companies and alter-egos to acquire and control VitaminSpice stock.

28.    On or around July 6, 2010, as a result of this information, Bukstel terminated Hand.  Bukstel also informed the transfer agent, Stalt, Inc. ("Stalt"), about Hand's improprieties in connection with the stock owned by Counter-Defendants and others who received VitaminSpice stock from Counter-Defendants through the efforts of Hand.  For example, Bukstel provided Stalt with documents showing Counter-Defendants' bogus addresses, shareholders, and officers, as well as additional documents (including forgeries by Hand) showing Hand's control over Counter-Defendants and their VitaminSpice stock.

29.    Despite Busktel's efforts to stop Hand's and Counter-Defendants' wrongful and unlawful transactions in VitaminSpice stock, Hand undertook efforts, and conspired and worked with Stalt, to permit Counter-Defendants to continue trading VitaminSpice stock.  Hand and Stalt profited from those transactions.  Hand concealed these facts from Bukstel and VitaminSpice, which relied on the concealment in that they waited for Stalt to implement stop-hold orders on Counter-Defendants' transactions, expecting Stalt to act as an independent transfer agent rather than work and conspire with Hand.  Stalt, however, failed to implement the stop-hold orders, and worked and conspired with Hand to permit Counter-Defendants to continue trading VitaminSpice stock.

30.     Hand undertook cover-up efforts to conceal the above-alleged wrongful conduct. Those cover-up efforts including the forgery of documents, the shredding of documents, and the destruction of evidence that would uncover his fraud and other misconduct.

31.     Hand's and Counter-Defendants' misconduct has had a substantial and detrimental impact on VitaminSpice and its stock.  After controlling the stock's float to drive up the share price, Hand and Counter-Defendants have sold the shares to reap the profits, leading to a substantial decrease in the value and price of VitaminSpice stock.

### CLAIMS FOR RELIEF

### Count I
### Fraud in Violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5, 15 USC. 78J, and 17 CFR 240.10B-5 – Against Hand and Counter-Defendants

32.     Bukstel and VitaminSpice reallege paragraphs 1-31 of their Counterclaims and Third-Party claims as though they were fully set forth herein.

33.     Hand and Counter-Defendants, directly and indirectly, with scienter, including with reckless disregard, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, have employed devices, schemes or artifices to defraud; and have engaged in acts, practices or courses of business which have been and are operating as a fraud upon the purchasers or sellers of such securities.

34.     Hand owned and/or controlled a substantial part of the float of VitaminSpice shares, by and through his control over Counter-Defendants and their VitaminSpice shares. Furthermore, Hand and Counter-Defendants misrepresented to Bukstel and VitaminSpice that Counter-Defendants were independent and viable entities, and failed to disclose Hand's beneficial and legal ownership and/or control over Counter-Defendants and their VitaminSpice stock.  Hand also failed to disclose such information in the VitaminSpice prospectus, which

Hand helped to prepare.   Hand and Counter-Defendants also concealed Hand's profits from Counter-Defendants' VitaminSpice transactions, and Hand's work and conspiracy with Stalt to allow Counter-Defendants to continue trading VitaminSpice stock.   In addition, Hand and Counter-Defendants misrepresented to Bukstel and VitaminSpice that Counter-Defendants were independent and viable entities.

35.     Hand and Counter-Defendants undertook these concealments and made these misrepresentations with knowledge of their falsity or with deliberate and reckless disregard for the truth.   Hand and Counter-Defendants also intended to undertake these concealments and make these misrepresentations in order to induce Bukstel and VitaminSpice to work with Hand, sign contracts, and permit Counter-Defendants to own and trade VitaminSpice stock.

36.     Bukstel and VitaminSpice reasonably relied on the concealments and misrepresentations by Hand and Counter-Defendants by, among other things, retaining Hand, agreeing to proceed with the reverse merger, allowing Hand to engineer the various transactions in which Counter-Defendants secured their shares of VitaminSpice stock, and allowing Counter-Defendants to trade and own VitaminSpice stock.   If Bukstel and VitaminSpice would have known the truth, they would never had retained Hand as VitaminSpice's counsel and/or proceeded with the reverse merger and transactions with Hand and Counter-Defendants.

37.     As a direct and proximate cause of Hand's and Counter-Defendants' misrepresentations and concealments, Bukstel and VitaminSpice have suffered damages far in excess of $75,000.00.

### Count II
### Common Law Fraud – Against Hand and Counter-Defendants

38.     Bukstel and VitaminSpice reallege paragraphs 1-37 of their Counterclaims and Third-Party claims as though they were fully set forth herein.

39.     Hand and Counter-Defendants made false statements of material facts to Bukstel and VitaminSpice in connection with the purchase and sale of VitaminSpice securities.   In particular, Hand and Counter-Defendants made false statements that Hand was an objective and independent attorney who would work on behalf of, and in the interest of, VitaminSpice; that Hand had no direct relationship with Counter-Defendants; that Hand did not have control over Counter-Defendants; and that Hand was not involved in the control and trading of VitaminSpice stock.

40.     Hand and Counter-Defendants also concealed material facts from Bukstel and VitaminSpice in connection with the purchase and sale of VitaminSpice stock.   In particular, Hand and Counter-Defendants concealed the facts that Hand did not work on behalf of, and in the interest of, VitaminSpice; that Hand had a direct relationship with Counter-Defendants; that Hand had control over Counter-Defendants; that Hand was involved in the control and trading of VitaminSpice stock; that Hand profited from Counter-Defendants' VitaminSpice transactions; and that Hand worked and conspired with Stalt to allow Counter-Defendants to continue trading VitaminSpice stock.

41.     Bukstel and VitaminSpice reasonably relied on the misrepresentations and concealments by Hand and Counter-Defendants by, among other things, retaining Hand, agreeing to proceed with the reverse merger, allowing Hand to engineer the various transactions in which Counter-Defendants secured their shares of VitaminSpice stock, and allowing Counter-Defendants to trade and own VitaminSpice stock.   If Bukstel and VitaminSpice would have known the truth, they would never had retained Hand as VitaminSpice's counsel and/or proceeded with the reverse merger and transactions with Hand and Counter-Defendants.

42.     Hand and Counter-Defendants undertook these concealments and made these misrepresentations with knowledge of their falsity or with deliberate and reckless disregard for the truth.  Hand and Counter-Defendants also intended to undertake these concealments and make these misrepresentations in order to induce Bukstel and VitaminSpice to work with Hand, sign contracts, and permit Counter-Defendants to own and trade VitaminSpice stock.

43.     As a direct and proximate cause of Hand's and Counter-Defendants' misrepresentations and concealments, Bukstel and VitaminSpice have suffered damages far in excess of $75,000.00.

**Count III**
**Negligent Misrepresentation – Against Hand and Counter-Defendants**

44.     Bukstel and VitaminSpice reallege paragraphs 1-43 of their Counterclaims and Third-Party claims as though they were fully set forth herein.

45.     Hand and Counter-Defendants made false statements of material facts to Bukstel and VitaminSpice in connection with the purchase and sale of VitaminSpice securities.  In particular, Hand and Counter-Defendants made false statements that Hand was an objective and independent attorney who would work on behalf of, and in the interest of, VitaminSpice; that Hand had no direct relationship with Counter-Defendants; that Hand did not have control over Counter-Defendants; and that Hand was not involved in the control and trading of VitaminSpice stock.

46.     Hand and Counter-Defendants also concealed material facts from Bukstel and VitaminSpice in connection with the purchase and sale of VitaminSpice stock.  In particular, Hand and Counter-Defendants concealed the facts that Hand did not work on behalf of, and in the interest of, VitaminSpice; that Hand had a direct relationship with Counter-Defendants; that Hand had control over Counter-Defendants; that Hand was involved in the control and trading of

VitaminSpice stock; that Hand profited from Counter-Defendants' VitaminSpice transactions; and that Hand worked and conspired with Stalt to allow Counter-Defendants to continue trading VitaminSpice stock.

47.   Bukstel and VitaminSpice reasonably relied on the misrepresentations and concealments by Hand and Counter-Defendants by, among other things, retaining Hand, agreeing to proceed with the reverse merger, and allowing Hand to engineer the various transactions in which Counter-Defendants secured their shares of VitaminSpice stock.  If Bukstel and VitaminSpice would have known the truth, they would never had retained Hand as VitaminSpice's counsel and/or proceeded with the reverse merger and transactions with Hand and Counter-Defendants.

48.   Hand and Counter-Defendants made these concealments and misrepresentations negligently, since they knew or should have known and disclosed the truth.

49.   As a direct and proximate cause of Hand's and Counter-Defendants' misrepresentations and concealments, Bukstel and VitaminSpice have suffered damages far in excess of $75,000.00.

**Count IV**
**Breaches of Fiduciary Duty – Against Hand**

50.   Bukstel and VitaminSpice reallege paragraphs 1-49 of their Counterclaims and Third-Party claims as though they were fully set forth herein.

51.   As VitaminSpice's attorney, Hand owed a fiduciary duties to VitaminSpice, including without limitation the duty to act loyally and/or to avoid conflicts of interest.

52.   Hand breached his fiduciary duties by, among other things, acting on behalf of himself and Counter-Defendants rather than VitaminSpice; engaging in and concealing numerous conflicts of interest from VitaminSpice; working with Counter-Defendants to profit

from the acquisition and sale of VitaminSpice stock; shredding VitaminSpice's documents; and

using VitaminSpice's confidential information and attorney-client communications improperly,

including to file this action, in gross violation of his ethical duties.

53.     As a direct and proximate cause of Hand's breaches of fiduciary duties, Bukstel

and VitaminSpice have suffered damages far in excess of $75,000.00.

WHEREFORE, for the reasons set forth above, in the event that the Court does not

dismiss this action as requested by motion, Bukstel and VitaminSpice respectfully request that

the Court enter judgment in their favor and against Hand and Counter-Defendants for

compensatory damages in an amount to be proven at trial, but in excess of $75,000.00, and such

other relief as the Court deems just and appropriate under the circumstances.


Dated:  July 22, 2011                          Respectfully submitted,


                                               /s/  Michael C. Falk
                                               Michael C. Falk, Esquire
                                               **REED SMITH LLP**
                                               2500 One Liberty Place
                                               1650 Market Street
                                               Philadelphia, PA 19103
                                               (215) 851-8100
                                               *Attorneys for Defendants VitaminSpice, Inc.*
                                               *and Edward Buksel*

<u>**CERTIFICATE OF SERVICE**</u>

I, Michael C. Falk, hereby certify that this 22nd day of July, 2011, the foregoing Edward Bukstel's and VitaminSpice, Inc.'s Answer, Affirmative Defenses, Counterclaims and Third-Party Claims was served via First Class Mail and filed electronically and is available for viewing and downloading from the Electronic Case Filing System.   The following counsel received service by mail:

> Jehu Hand
> Hand & Hand
> 24351 Pasto Road #B
> Dana Point, CA  92629
> E-Mail:   handandhandpc@aol.com

> Peter E. Sheridan
> P.O. Box 12331
> Philadelphia, PA 19119
> (617) 759-0099
> E-Mail:  Sheridan.pete@gmail.com

> <u>/s/ Michael C. Falk             </u>
> Michael C. Falk